

WENDELEN I. LIPP
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| Claud Anderson, | : | Case No.: 15-18781-WIL |
| | : | Chapter 7 |
|     Defendant. | : | |
| ——————————————— | : | |
| | : | |
| The Harbor Bank of Maryland, et al., | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | Consolidated Adv. Proc. No.: 15-00685 |
| | : | |
| Claud Anderson, | : | |
| | : | |
|     Defendant. | : | |

### MEMORANDUM OPINION

Before the Court are two separate complaints filed against the Defendant.    The first is a

Complaint Objecting to Discharge of Debts (the "Maryland Complaint") filed by the State of

Maryland, Department of Commerce ("Commerce") and the Maryland Agriculture &

Resource-Based Industry Development Corporation ("MARBIDCO")(together, Commerce and

MARBIDCO are the "Maryland Plaintiffs").    The second is the Amended Complaint Objecting

to Discharge Under 11 U.S.C. § 727 and for Determination of Dischargeability of Debt Pursuant

to 11 U.S.C. § 523 (the "Harbor Bank Complaint") filed by The Harbor Bank of Maryland

("Harbor Bank").   The Defendant filed answers to both complaints.   Because the issues raised in

the two complaints significantly overlap, the Court consolidated the separate adversary

proceedings into the above-captioned proceeding.   After protracted pretrial proceedings, the

Court held a four-day trial on March 20, 2017, and March 28-30, 2017.   At the conclusion of the

trial, the Court permitted the parties to file post-hearing memoranda.   The Defendant filed a

post-trial Memorandum on May 8, 2017, to which the Plaintiffs filed responses.   The Debtor then

filed a Motion to Take Judicial Notice of an Unreported Decision of the Court of Special Appeals

of Maryland on August 3, 2017, which the Court granted on September 29, 2017, for the limited

purposes of noting that the Court of Special Appeals of Maryland filed an Unreported Opinion on

May 8, 2017, in *The Harbor Bank of Maryland v. Kramon & Graham, P.A.*

The Court has considered the pleadings filed by the parties, the oral arguments made by

counsel, the testimony given at trial, and the exhibits admitted into evidence.   For the following

reasons, the Court determines that the debts owed by the Defendant to Harbor Bank are

nondischargeable in the Defendant's bankruptcy case pursuant to 11 U.S.C. § 523(a)(6).   The

Court further determines that the Defendant is entitled to a Chapter 7 discharge other than of his debt

to Harbor Bank, and that the debts owed by the Defendant to the Maryland Plaintiffs are

dischargeable in the Defendant's bankruptcy case.

I.     **Facts**

    A.     **Joint Stipulation of Facts**

The parties stipulated to the following facts in a Joint Stipulation of Facts filed on March 1,

2017 [Docket Entry No. 143]:

    1. Waterland Fisheries, Inc. ("Waterland") was a Michigan corporation, incorporated on
    July 7, 2006, and dissolved on February 11, 2016.

2

2. On or about April 16, 2007, Waterland purchased the real property generally known as 299 Nealson Street, Hurlock, Maryland 21643 (the "Property").

3. From the date Waterland was incorporated until the date Waterland was dissolved, the Defendant/Defendant (the "Defendant") was the President and Chairman of the Board of Directors for Waterland.

4. On or about June 27, 2008, Harbor Bank extended a $750,000.00 commercial loan (the "Harbor Bank Loan") to Waterland as evidenced and secured by, among other things, the following loan documents, as to which the parties stipulated to the authenticity and admissibility:

 a. Term Loan Note, dated June 27, 2008, in the principal amount of $750,000.00, executed and delivered by Waterland to the order of Harbor Bank (Harbor Bank Ex. No. 1);

 b. Building Loan Agreement, dated June 27, 2008, executed by and between Waterland and Harbor Bank (Harbor Bank Ex. No. 3);

 c. Guaranty Agreement, dated June 27, 2008, executed by the Defendant (Harbor Bank Ex. No. 5);

 d. Deed of Trust and Assignment of Leases and Rents, dated June 27, 2008, executed by Waterland and recorded in the Land Records of Dorchester County, Maryland in Liber 0876, folio 001 (Harbor Bank Ex. No. 7);

 e. Security Agreement, dated June 27, 2008, executed by and between Waterland and Harbor Bank (the "Harbor Bank Security Agreement")(Harbor Bank Ex. No. 9);

 f. UCC Financing Statement filed with the Michigan Secretary of State on January 16, 2009, File No. 2009008189-6 and UCC Financing Statement Amendment filed with the Michigan Secretary of State on November 6, 2013, File No.2013159863-7 (Harbor Bank Ex. No. 11);

 g. UCC Financing Statement recorded among the Land Records of Dorchester County, Maryland at Liber 876, folio 21 (Harbor Bank Ex. No. 12); and

 h. Subordination and Intercreditor Agreement, dated June 27, 2008, executed by and between Harbor Bank, Waterland, MARBIDCO and Delmarva Premium Seafood ("Delmarva") (Harbor Bank Ex. No. 13).

5. On June 27, 2008, MARBIDCO extended a $300,000.00 loan to Waterland as evidenced and secured by, among other things, the following loan documents, as to which the parties stipulated to the authenticity and admissibility:

3

a. Loan Agreement (Maryland Plaintiffs Ex. No. 1);

b. Security Agreement (Maryland Plaintiffs Ex. No. 1);

c. Deed of Trust & Assignment of Leases and Rents (Maryland Plaintiffs Ex. No. 1);

d. Deed of Trust Note (Maryland Plaintiffs Ex. No. 1); and

e. Personal Guaranty Agreement (Maryland Plaintiffs Ex. No. 2).

6. In 2008, Waterland obtained, among other things, casualty, commercial liability and property damage insurance coverage for the Property from Selective Insurance Company of America and/or Selective Way Insurance Company ("Selective"), through Policy No. S1586046 (the "Policy").

7. In February 2010, a storm caused interior and exterior damage to the Property (the "First Loss").

8. In May 2010, Waterland submitted a claim for coverage for the First Loss, under the Policy, to Selective, which claim Selective subsequently denied.

9. In December 2012, rain and ice caused interior and exterior damage to the Property (the "Second Loss").

10. In December 2012, Waterland submitted a claim for coverage for the Second Loss, under the Policy, to Selective.

11. On or about January 16, 2013, the Defendant executed the following documents, as to which the parties stipulated to the authenticity and admissibility:

a. Demand Note, dated January 16, 2013, in the principal amount of $510,000.00, executed by Waterland to the order of Joann Anderson, et al. (the "Anderson Demand Note") (Harbor Bank Ex. No. 34) (Defendant Ex. No. A); and

b. Security Agreement, dated January 16, 2013, executed by and between Waterland and Joann Anderson, et al. (the "Anderson Security Agreement") (Harbor Bank Ex. No. 35) (Defendant Ex. No. B).

12. On or about January 30, 2013, Joann Anderson filed the following document with the Michigan Department of State as to which the parties stipulated to the authenticity and admissibility:

a. UCC Financing Statement (Defendant Ex. No. C, pg. 1).

4

13. On or about July 25, 2013, Harbor Bank and Waterland consolidated, amended and restated the Harbor Bank Loan, resulting in a principal balance of $1,049,365.45 (the "Harbor Bank Consolidated Loan"), as evidenced and secured by, among other things, the following loan documents, as to which the parties stipulated to the authenticity and admissibility:

      a. Consolidated, Amended and Restated Promissory Note, dated July 25, 2013, in the principal amount of $1,049,365.45, executed and delivered by Waterland to the order of Harbor Bank (Harbor Bank Ex. No. 2);

      b. Consolidated, Amended and Restated Loan Agreement, dated July 25, 2013, executed by and between Waterland, the Defendant and Harbor Bank (Harbor Bank Ex. No. 4);

      c. Consolidated, Amended and Restated Guaranty, dated July 25, 2013, executed by the Defendant (Harbor Bank Ex. No. 6);

      d. Consolidated, Amended and Restated Deed of Trust, Assignment of Rents and Leases, and Security Agreement, dated July 25, 2013, executed by Waterland and recorded among the Land Records of Dorchester County, Maryland in Liber 1162, folio 370 (Harbor Bank Ex. No. 8);

      e. Consolidated, Amended and Restated Security Agreement, dated July 25, 2013, executed by and between Waterland and Harbor Bank (Harbor Bank Ex. No. 10);

      f. Consolidated, Amended and Restated Subordination and Intercreditor Agreement, dated July 26, 2013 (the "Consolidated Intercreditor Agreement"), executed by and between Harbor Bank, Waterland, MARBIDCO, Delmarva and the Maryland Small Business Development Financing Authority ("MSBDFA") (Harbor Bank Ex. No. 14); and

      g. Certificate of Corporate Borrowing, Resolutions, Charter, Bylaws and Incumbency, dated July 25, 2013, executed by Waterland listing Claud Anderson as Waterland's President and Joann Anderson as Waterland's Secretary (Harbor Bank Ex. No. 33).

14. On July 26, 2013, Commerce, by and through MSBDFA, extended a $350,000.00 loan to Waterland (the "Commerce Loan") as evidenced and secured by, among other things, the following loan documents, as to which the parties stipulated to the authenticity and admissibility:

      a. Loan and Security Agreement (Maryland Plaintiffs Ex. No. 3);

      b. Promissory Note (Maryland Plaintiffs Ex. No. 3);

c. Deed of Trust (Maryland Plaintiffs Ex. No. 3);

d. Assignment of Leases and Rents (Maryland Plaintiffs Ex. No. 3);

e. Guaranty of Payment (Maryland Plaintiffs Ex. No. 4);

f. Assignment of Insurance Proceeds (Maryland Plaintiffs Ex. No. 5);

g. Subordination and Intercreditor Agreement between Commerce and Joann Anderson (the "Anderson Subordination Agreement") (Maryland Plaintiffs Ex. No. 6);

h. Amended and Restated Subordination and Intercreditor Agreement between Waterland, MARBIDCO, Delmarva, Harbor Bank and Commerce (the "Consolidated Intercreditor Agreement") (Maryland Plaintiffs Ex. No. 7); and

i. UCC Financing Statements (Maryland Plaintiffs Ex. No. 8).

15. On or about February 27, 2014, Waterland filed a lawsuit against Selective in the United States District Court for the District of Maryland, Case No. 1:14-cv-00585-RDB (the "Selective Lawsuit"), in connection with the First Loss and Second Loss.

16. On or about July 18, 2014, Waterland and Selective attended mediation, in connection with the Selective Lawsuit at which time Waterland and Selective reached a settlement with respect to the First Loss, Second Loss and Lawsuit (the "Insurance Settlement").

17. As a part of the Insurance Settlement, Selective agreed to pay Waterland the amount of $800,000.00 (the "Settlement Amount"), as evidenced by, among other things, the following documents, as to which the parties stipulated to the authenticity and admissibility:

a. Settlement Agreement and General Release, dated July 25, 2014, executed by and between Waterland and Selective (the "Settlement Agreement") (Harbor Bank Ex. No. 27); and

b. Check, dated July 29, 2014, in the amount of $800,000.00 (the "Settlement Check"), payable to Waterland and Kramon & Graham, P.A. and accompanying payment detail (Harbor Bank Ex. No. 28) (Maryland Plaintiffs Ex. No. 12) (Defendant Ex. No. R).

18. The Settlement Check was delivered to Waterland's counsel, Kramon & Graham, P.A. (Kramon & Graham), in August, 2014.

19. In addition to all of the aforementioned exhibits, the parties stipulated to the authenticity and admissibility of the following documents:[1]

    a. Bylaws of Waterland Fisheries, Inc., dated July 7, 2006 (Harbor Bank Ex. No. 32);

    b. Correspondence, dated June 13, 2008, from Georgetown Insurance Service, Inc. to Harbor Bank (Harbor Bank Ex. No. 15) (Defendant Ex. No. Z);

    c. Correspondence, dated May 6, 2014, from the Defendant to Anthony Williams at Meridian Management Group ("MMG") (Harbor Bank Ex. No. 38) (Maryland Plaintiffs Ex. No. 25);

    d. Order, dated May 13, 2014, entered by the Honorable Jillyn K. Schulze in the Selective Lawsuit[2] (Maryland Plaintiffs Ex. No. 15) (Defendant Ex. No. H);

    e. Waterland's 2014 Tax Returns (Maryland Plaintiffs Ex. No. 23);

    f. Memo, dated June 14, 2014, from the Defendant to, among others, Harbor Bank and MARBIDCO (Harbor Bank Ex. No. 20) (Defendant Ex. No. P);

    g. Check, dated August 15, 2014, in the amount of $439,000.00, payable to Joann Anderson and written on Waterland's United Bank Account No. xxxx3800 as Check No. 1342 (the "Anderson Check") (Harbor Bank Ex. No. 31);

    h. Waterland's United Bank Account Agreement (Maryland Plaintiffs Ex. No. 9) (Defendant Ex. No. D);

    i. Payment records for loan from Joann Anderson, et al. to Waterland (Harbor Bank Ex. No. 36);

    j. 2014 Correspondence from the Defendant to, among others, Stanley Tucker (Defendant Ex. No. S);

    k. Correspondence, dated June 19, 2015, from the Defendant to, among others, Harbor Bank, MARBIDCO and MSBDFA (Harbor Bank Ex. No. 26) (Maryland Plaintiffs Ex. No. 11) (Defendant Ex. No. Q); and

---

[1] All referenced documents were included in the Joint Stipulation of Facts filed on March 1, 2017.   The Court listed the documents chronologically as opposed to the order in which they appear in the Joint Stipulation of Facts.

[2] The "Order" stipulated to by the parties is a letter from United States Magistrate Judge Jillyn Schulze dated May 13, 2014, scheduling a settlement conference between Waterland and Selective for August 20, 2014, and detailing the settlement procedures.   The Parties consistently referred to the letter as an Order.

l. Sales Report, dated July 20, 2016, prepared by Rasmus Auctions in connection with the auction of Waterland's personal property (Harbor Bank Ex. No. 40);

## B.    Additional Findings of Fact

In addition to the stipulated facts set forth above, the Court finds that the following facts are relevant to the issues at hand and are either uncontroverted or are supported by the evidence in this case:[3]

1. Waterland was a Maryland indoor aquaculture company that produced live fish on Maryland's eastern shore.   Waterland began production in 2008 and shipped its first tilapia stock on April 16, 2008.

2. In addition to being Waterland's President and Chairman of its Board of Directors, Defendant was the sole shareholder of Waterland as of the spring of 2013.

3. Joann Anderson is the Defendant's spouse.   Joann Anderson performed administrative duties for Waterland during all relevant time periods on a volunteer basis, including paying Waterland's bills and making deposits into Waterland's account(s). Joann Anderson was also Waterland's Secretary and Treasurer during all relevant timeframes.

4. Stanley Arnold, a Senior Vice President and Senior Lending Officer for Harbor Bank,[4] was the loan officer that handled Waterland's account with Harbor Bank starting in 2012, prior to the Second Loss.   Stanley Arnold dealt with both the Defendant and Joann Anderson in connection with Waterland's loan but mostly dealt with Joann Anderson. *See* Tr. March 20, 2017, p. 13.

5. An email sent from Stanley Arnold to Joann Anderson on February 4, 2013, indicated that he was still waiting for details on Waterland's outstanding debts.   Joann Anderson's response to Mr. Arnold, sent on February 4, 2013, listed the loans from MARBIDCO and Delmarva but did not include the loan she made to Waterland as evidenced by the Anderson Demand Note and Anderson Security Agreement, both of which were executed on January 16, 2013—less than three weeks prior to her response.   *See* Harbor Bank Ex. 37.

---

[3] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

[4] Prior to his current position, Mr. Stanley was a Commercial Loan Officer at Harbor Bank.

6. At trial, Joann Anderson could not definitively explain why she did not include her $510,000.00 loan to Waterland in her February 4, 2013 email response to Mr. Arnold, nor could she recall when or if she gave notice to Harbor Bank of her loan to Waterland. *See* Tr. March 20, 2017, pp. 149-50.

7. The UCC Financing Statement filed by Joann Anderson on or about January 30, 2013, covered, among other things, all of Waterland's personal property and fixtures, "whether now in existence or whether acquired or created at any time hereafter" and included all deposit accounts.   *See* Defendant Ex. No. C, pg. 1.

8. Harbor Bank did not consent to Waterland granting Joann Anderson a lien on Waterland's assets pursuant to the Anderson Security Agreement and the alleged encumbrance constituted a default under the Harbor Bank Loan, although the testimony was unclear as to what date Harbor Bank declared Waterland in default.   *See* Tr. March 20, 2017, pp. 218-19.

9. Stanley Arnold testified that he checked to see what UCC Financing Statements were on file prior to the closing on the Harbor Bank Consolidated Loan and that he did not specifically discover the UCC Financing Statement filed by Joann Anderson on January 30, 2013.   *See* Tr. March 20, 2017, pp. 31-32.

10. The Security Agreements evidencing the Harbor Bank Loan and the Harbor Bank Consolidated Loan granted Harbor Bank a security interest in insurance proceeds. *See* Harbor Bank Ex. Nos. 8 and 9.

11. The loan agreements evidencing the Maryland Plaintiffs' various loans to Waterland granted the Maryland Plaintiffs a security interest in insurance proceeds.   *See* Maryland Plaintiffs Ex. Nos. 1 and 3.

12. The Consolidated Intercreditor Agreement defines "Insurance Proceeds" as "any insurance proceeds paid, or to be paid by Selective Insurance Company to [Waterland] under claim number 212743371."   Claim No. 21274371 was for the Second Loss and was included in the Insurance Settlement.   *See* Harbor Bank Ex. Nos. 14 and 28.

13. The Consolidated Intercreditor Agreement set forth the following priority scheme between Waterland's secured creditors with respect to any insurance proceeds paid by Selective to Waterland for the Second Loss (the "Insurance Proceeds"):

1) Harbor Bank
2) Commerce
3) MARBIDCO
4) Delmarva

*See* Harbor Bank Ex. No. 14, p. 9.

14. MARBIDCO entered into the Consolidated Intercreditor Agreement to protect its security interest because at the time, there was already damage to the Property and MARBIDCO believed that its security interest would be "underwater" if Commerce did not extend the Commerce Loan to improve the viability of Waterland.   *See* Tr. March 28, 2017, pp. 12-13.

15. The UCC Financing Statement that MARBIDCO filed in connection with its 2008 loan to Waterland had lapsed as of July 2014, after Joann Anderson filed her UCC Financing Statement.   MARBIDCO's financing statement was not reinstated until April 2015.   *See* Tr. March 28, 2017, pp. 26-27.

16. Commerce was aware of the Anderson Security Agreement and the pending insurance claims against Selective when it extended the Commerce Loan.   *See* Tr. March 28, 2017, pp. 39-40, 62.

17. The execution of the Assignment of Insurance Proceeds by Waterland in favor of Commerce was required as part of the Commerce Loan because it was a high-risk transaction and the "insurance proceeds was a key factor in providing some form of return on this investment, and collateral for the loan."   *See* Tr. March 28, 2017, pp. 93-95.

18. The Maryland Plaintiffs would not have entered into the Consolidated Intercreditor Agreement absent the pledge of the Insurance Proceeds, and Commerce would not have extended the Commerce Loan absent the Assignment of Insurance Proceeds between Waterland and Commerce and the Anderson Subordination Agreement between Commerce and Joann Anderson.   *See* Tr. March 28, 2017, pp. 12-15, 40, 46.

19. Waterland opened a deposit account at United Bank on August 1, 2013 (United Bank Account xxxx3800 hereafter referred to as the "Waterland Deposit Account").   The Defendant and Joann Anderson are both listed as authorized signers on the Account Agreement establishing the Waterland Deposit Account.   *See* Defendant's Ex. No. D.

20. The Waterland Deposit Account was opened approximately six days after execution of the Anderson Subordination Agreement pursuant to which Joann Anderson agreed to subordinate her interest in all of Waterland's "existing and future assets" to Commerce. *See* Defendant Exs. D and J.   Joann Anderson testified that the Waterland Deposit Account was established to receive the proceeds from the Commerce Loan to keep those funds separate from Waterland's other assets and was not established to circumvent the Anderson Subordination Agreement.   *See* Tr. March 20, 2017, p. 182-83; Tr. March 29, 2017, p. 83.

21. Joann Anderson testified that she believed the Anderson Subordination Agreement subordinated her interest in all of the collateral listed in the UCC Financing Statement she filed on January 30, 2013 to Commerce, except for her interest in the Waterland Deposit Account because she had "control" of the Waterland Deposit Account based on her status as a secured lender and Secretary of Waterland.   *See* Tr. March 29, 2017, p. 18.

22. None of the Plaintiffs had a separate "bank account control agreement" with Waterland regarding Waterland's bank accounts, however, the Plaintiffs' respective security interests covered all of Waterland's bank accounts.   *See* Tr. March 20, 2017, p. 37; Tr. March 28, 2017, pp. 28-29, 71.   *See also* Maryland Plaintiffs Ex. Nos. 1 and 3; Harbor Bank Ex. No. 10.

23. Joann Anderson was not listed as a secured creditor in the Account Agreement between United Bank and Waterland governing the Waterland Deposit Account, nor did she have a bank account control agreement with United Bank requiring United Bank to comply with her instructions as a secured party regarding any funds in the Waterland Deposit Account.   *See* Maryland Plaintiffs Ex. No. 9*; see also* Tr. March 20, 2017, pp. 170-71, 176-77.

24. Prior to July 2014, the Defendant provided updates on Waterland and the Selective Lawsuit to Harbor Bank approximately every other month and indicated that Waterland would use whatever insurance proceeds it received from Selective to pay Harbor Bank's loan down and/or off.   *See* Tr. March 20, 2017, pp. 14, 188.

25. The Defendant told the Plaintiffs on several occasions that he believed the insurance proceeds from the Selective Lawsuit would be between two and three million dollars and would be sufficient to pay off all of Waterland's secured creditors.   *See* Tr. March 20, 2017, p. 35; Tr. March 28, 2017, pp. 46, 60.

26. In a memo to the President of Meridian Management Group (Commerce's underwriter for its loan to Waterland) sent via facsimile on June 6, 2014, the Defendant wrote, among other things, that Waterland would cease operations on June 6, 2014 because it had run out of funds to operate.   The memo further stated that Waterland had been unable to settle with Selective and that Selective had obtained several postponements of the scheduled mediation and that mediation was now scheduled for August 20, 2014.   The second page of the memo stated that Defendant and his family had fought hard to keep Waterland a viable entity and that they personally do not have any further funds available to invest in Waterland.   *See* Maryland Plaintiffs Ex. No. 16; Tr. March 28, 2017, pp. 97-99.

27. By letter dated June 14, 2014, Defendant informed the Plaintiffs that Waterland was in a severe cash crunch and was awaiting a "mediated settlement scheduled by the court for August 20, 2014."   The June 14, 2014 Letter further stated that the "mediation settlement set by the judge for August 20, 2014, involves [Waterland's] claim of more than $3 million dollars, which we hope will produce enough to pay off all of our secured lenders." *See* Harbor Bank Exhibit No. 20.

28. An email dated July 3, 2014, from the Defendant to Darius Davis and Stanley Arnold (both employees at Harbor Bank) stated:

> As of yesterday, July 2, the [Waterland] vs Selective Insurance Company Lawsuit mediation date has been moved up to July 18, 2014.   We have

> every reason to believe that [Waterland] will receive sufficient funds from
> Selective to payoff our secured creditors. We are still requesting
> forbearance from Harbor through the scheduled mediation.

*See* Harbor Bank's Ex. 21.

29. An email dated July 3, 2014 from Joann Anderson to Anthony Williams of MMG
stated:

> This email is to update you. As of yesterday, July 2, the [Waterland] vs
> Select Insurance Company lawsuit mediation date has been moved up to
> July 18, 2014.   We have every reason to believe that [Waterland] will
> receive sufficient funds from Selective to payoff our secured creditors. We
> will keep you informed.

*See* Maryland Plaintiffs' Exhibit No. 20.

30. Selective and Waterland attended the aforementioned mediation on July 18, 2014, at
which time they reached the Insurance Settlement, which was memorialized in the
Settlement Agreement.   The Settlement Agreement contained a confidentiality clause
limiting its disclosure to specified parties, none of which were the Plaintiffs.
Nevertheless, the Settlement Agreement's confidentiality provision contained the
following exception:

> Nothing contained in this paragraph shall prevent any Party from stating
> that the Parties have "amicably resolved all differences," provided
> however, that in so doing, the Parties shall not disclose the fact or amount of
> any payments made or to be made hereunder and shall not disclose any
> other terms of this Agreement or the settlement described herein.

*See* Harbor Bank Ex. No. 27.

31. None of the Plaintiffs sought to intervene in the Selective Lawsuit nor did any
Plaintiff file a letter of protection with Waterland's counsel in the Selective Lawsuit
asserting a claim to any insurance proceeds.   *See* Tr. March 20, 2017, p. 43; Tr. March
28, 2017, pp. 28, 68.

32. On July 29, 2014, the date that Selective issued the Settlement Check payable to
Waterland and Kramon & Graham, Joann Anderson emailed an attorney at Kramon &
Graham requesting that the settlement proceeds be wired to the Waterland Deposit
Account and asked the attorney to call her "as soon as the funds are sent."   In response,
Kramon & Graham informed the Defendant and Joann Anderson that the funds could not
be wired until a "memo of settlement has been reviewed and signed by [the Defendant]."
*See* Harbor Bank Ex. Nos. 28 and 29.

33. A Settlement Memorandum prepared by Kramon & Graham and signed by the

Defendant on August 11, 2014, reflects that after payment of Kramon & Graham's legal fees and other fees and expenses, the net amount of the settlement proceeds payable to Waterland was $467,115.80 (the "Settlement Proceeds") and were to be wired to the Waterland Deposit Account per the "client's instructions."   *See* Harbor Bank Ex. No. 30.

34. The Defendant's correspondence to Harbor Bank between July 30, 2014, and August 12, 2014, concerned the potential sale of Waterland and did not mention the Insurance Settlement, the Settlement Amount or the Settlement Check, including an August 12, 2014 email from the Defendant to Stanley Arnold stating:

> Got your email. We are trying to address a critical inventory issue and parties interested in buying the Fish Farm. By the end of next week, I plan to present Harbor with a plan to take care of WFI's debt.

*See* Harbor Bank's Ex. Nos. 22-25.

35. The August 2014 bank statement for the Waterland Deposit Account reflects receipt of a wire transfer in the amount of $459,615.80 on August 15, 2014, and includes Check No. 1342 dated August 15, 2014, in the amount of $439,000.00, which was payable to Joann Anderson and signed by Joann Anderson (the "Anderson Transfer").   *See* Harbor Bank Ex. Nos. 31 and 43.

36. The Anderson Transfer consisted of funds from the Insurance Settlement.   *See* Tr. March 20, 2017, p. 144.

37. Joann Anderson was present at the mediation on July 18, 2014.   She testified that she learned at the mediation that there was going to be insufficient funds for Waterland to pay its secured lenders in full so she decided to make demand under the Anderson Loan Documents by effectuating the Anderson Transfer.   *See* Tr. March 29, 2017, pp. 28-29.

38. Joann Anderson testified that she relied on the advice of the restructuring experts the Defendant hired to restructure Waterland[5] when she effectuated the Anderson Transfer under the belief that she had a first-priority security interest in the Waterland Deposit Account based on her status as a secured creditor of Waterland and the signature cards on file with United Bank listing her as an authorized signer on the Waterland Deposit Account.   Joann Anderson believed that the Anderson Security Agreement and the signature card on file with United Bank gave her "control" over the Waterland Deposit Account.   *See* Tr. March 20, 2017, pp. 158-160, 170-71, 175-80; *see* Tr. March 29,

---

[5]  Percy Squire, Defendant's trial counsel, was one of the restructuring experts hired by the Defendant whose advice Joann Anderson said she relied on when deciding to remove the Settlement Proceeds from the Waterland Deposit Account.   Mr. Squire also represented himself to Anthony Williams as a business advisor to Waterland in 2013 when the parties were closing the Commerce Loan.   *See* Tr. March 28, 2017, p. 111-12.

2017, pp. 34-35.

39. Joann Anderson testified that her husband was aware that Waterland's restructuring experts had advised her that she was the only secured lender with "control" over the Waterland Deposit Account and therefore, she had superior rights to any funds in the account.   *See* Tr. March 29, 2017, p. 36.   Nevertheless, Joann Anderson testified that she did not ask the Debtor's permission prior to transferring the funds to herself.   *Id.*

40. Waterland was not in default under the Anderson Demand Note at the time of the Anderson Transfer.   *See* Tr. March 29, 2017, p. 56.

41. Joann Anderson testified that she relied on the advice of Waterland's restructuring experts that she was not required to make demand upon Waterland under the Anderson Demand Note prior to effectuating the Anderson Transfer.   *See* Tr. March 29, 2017, p. 79.

42. Despite a provision in the Anderson Subordination Agreement executed on July 26, 2013 (with Commerce), Joann Anderson did not request permission from Commerce prior to foreclosing on her security interest in the Waterland Deposit Account by effectuating the Anderson Transfer.   *See* Maryland Plaintiffs Ex. No. 6.

43. The Plaintiffs did not give the Defendant or Waterland permission to transfer the Insurance Proceeds to any other entity, nor did they give Joann Anderson permission to remove the proceeds from the Waterland Deposit Account.

44. Joann Anderson testified that part of the reason she effectuated the Anderson Transfer was so she could loan a portion of the funds back to Waterland to increase its going concern value.   *See* Tr. March 29, 2017, pp. 34-35.

45. Joann Anderson testified that she paid Waterland an additional $150,000.00 after receiving the Waterland Transfer, most of which she testified was deposited into the Waterland Deposit Account.   *See* Tr. March 20, pp. 146-48.   This was not supported by the bank statements for the Waterland Deposit Account covering the months of August 2014 through July 2015, which indicate that only $10,663.66 was deposited into the Waterland Deposit Account during those months.   *See* Harbor Bank's Ex. Nos. 51-61, *see also* Tr. March 29, 2017, pp. 49-54.   It is unclear whether Joann Anderson eventually deposited $150,000.00 into the Waterland Deposit Account as part of the settlement of litigation between Joann Anderson and Harbor Bank.

46.   Defendant met with Harbor Bank on or around August 22, 2014, at the Defendant's request.   *See* Harbor Bank Ex. No. 25; *see also* Tr. March 20, 2017, p. 16.   The Defendant did not disclose the existence of the Insurance Settlement or the Anderson Transfer at the August 22, 2014 meeting.   *See* Tr. March 20, 2017, p. 16.

47. Defendant testified that he was prohibited from disclosing the existence of the Insurance Settlement to Harbor Bank by three documents: (i) an Order issued by United

14

States Magistrate Judge Jillyn K. Schulze;[6] (ii) the Settlement Agreement itself, and (iii) another court order issued by a federal judge,[7] although he later clarified that he believed it was Judge Schulze's May 13, 2014 Order that precluded him from disclosing the Insurance Settlement to the Plaintiffs, but did not preclude him from informing the parties that mediation had been scheduled.  *See* Tr. March 20, 2017, pp. 57-68, 110-114.

48. The Defendant testified that he was never "officially released" from the confidentiality provision of Judge Schulze's letter and only disclosed the terms of the Insurance Settlement after Harbor Bank subpoenaed the settlement documents from Selective.  *See* Tr. March 20, 2017, pp. 64-65.

49. On March 31, 2015, Joann Anderson sent an email to MARBIDCO on which the Defendant was copied stating:

> There was a settlement, however the settlement details are the subject of a confidentiality agreement.  Any request for details should be submitted to Waterland's insurance counsel, Robert Trautman[.]

*See* Maryland Plaintiffs' Ex. No. 10.  Stephen McHenry, MARBIDCO's Executive Director, testified that this was the first time MARBIDCO learned that the Selective Lawsuit had settled.  *See* Tr. March 28, 2017, pp. 15-19.

50. Upon receipt of Joann Anderson's email on March 31, 2015, MARBIDCO contacted Waterland's other secured lenders to find out what they knew of the Insurance Settlement.  *See* Tr. March 28, 2017, p. 20.

51. Joann Anderson sent another email to MARBDICO dated April 2, 2015, regarding a potential meeting between the secured lenders.  The April 2, 2015 email stated, in part:

> The respective rights of the secured lenders under the loan documents and under Maryland law to any and all [Waterland] collateral, including insurance proceeds, will no doubt be discussed at that time. I will let Dr. Anderson know that you attempted to reach him. Hope this helps.

---

[6] As noted earlier, the "Order" referenced by the Defendant during his direct examination was actually a letter from United States Magistrate Judge Jillyn Schulze dated May 13, 2014, scheduling a settlement conference between Waterland and Selective for August 20, 2014, and detailing the settlement procedures.  The letter provided that the "settlement conference process will be confidential and disclosure of confidential dispute resolution communication is prohibited."  Ultimately, instead of attending the settlement conference with Judge Schulze, Waterland and Selective mediated their dispute before the Honorable Richard Sothoron (Ret.) on July 18, 2014— outside of the Selective Lawsuit.  See Harbor Bank Ex. No. 27 and Defendant's Ex. No. H.

[7] When pressed at trial, the Defendant could not recall if the "order" issued by the federal judge was oral or written, and waivered as to whether there was an actual court order or whether someone had told him that there was a federal law prohibiting the disclosure of anything confidential.

*See* Maryland Plaintiffs Ex. No. 10.

52. Harbor Bank learned in December 2014 that the Selective Lawsuit had settled and learned the terms of the settlement in January 2015, when it received a copy of the Settlement Agreement in response to a subpoena issued by Harbor Bank to Selective. *See* Tr. March 20, 2017, pp. 15-17.

53. Commerce learned in early 2015 that the Selective Lawsuit had settled.  *See* Tr. March 28, 2017, p. 47.

54. The Parties had a meeting on April 10, 2015.  The "Agenda" for the April 10, 2015 meeting, which is on MMG letterhead, includes a "Discussion of the Status of the Insurance Recovery(?)."  The Defendant testified that Carla Nealy, an officer with Harbor Bank, disclosed at the April 10, 2015 meeting that the Selective Lawsuit had settled.  Nevertheless, the Defendant maintained at the meeting that he could not discuss the terms of the settlement because they were confidential.  *See* Defendant's Ex. No. O; *see* Tr. March 20, 2017, pp. 64-65, 118-19, 190; Tr. March 28, 2017, p. 48.

55. The Defendant sent a letter dated June 19, 2015, to the Plaintiffs, among other parties, informing them that Waterland was surrendering all collateral securing the loan agreements between Waterland and its secured creditors and requesting acceptance of the collateral in full satisfaction of all debts and waiver of any deficiency.  The June 19, 2015 letter stated that Waterland was continuing with its efforts to sell its assets to an arms-length purchaser.  The June 19, 2015 letter outlined the priority scheme established by the Consolidated Intercreditor Agreement, and specifically recites that Harbor Bank has a first-priority lien in the Insurance Proceeds and MSBDFA (Commerce) has a second-priority lien in the Insurance Proceeds.  The June 19, 2015 letter further explained:

> WFI's deposit account was not maintained or controlled by any WFI creditor except JAnderson.  Accordingly, in order to sustain WFI operations for the past 18 months JAnderson exercised her possessory lien as senior secured creditor in relation to WFI's deposit account and seized all insurance action proceeds, minus substantial attorneys fees and a substantial payment to the public adjuster.  This amount equaled roughly 50% of the total insurance settlement.  From this amount JAnderson reduced secured debt owed by WFI and advanced an additional $150,000.00 to WFI to sustain operations to date.

*See* Harbor Bank Ex. No. 26**.**

56. The June 19, 2015 letter was sent less than a week before the Defendant filed his bankruptcy petition.  The June 19, 2015 letter was the first time the Defendant confirmed to the Maryland Plaintiffs that a settlement had occurred and was the first time all of the Plaintiffs learned of the Anderson Transfer.  *See* Tr. March 20, 2017, pp.

16

17-18, 117-18; Tr. March 28, 2017, pp. 22-23, 49-50, 104-05.

57. The Plaintiffs did not receive any of the Insurance Proceeds from either the Defendant or Waterland, despite provisions in the various loan documents assigning any insurance proceeds to the Plaintiffs and despite the priority scheme applicable to any insurance proceeds set forth in the Consolidated Intercreditor Agreement, the Assignment of Insurance Proceeds, and the Anderson Subordination Agreement.

58. The Defendant testified that he had no input as to where the Insurance Proceeds went and that he left that decision "to the attorneys" but admitted to signing the Kramon & Graham Settlement Memorandum, which directed that the remaining funds be transferred via wire transfer to the Waterland Deposit Account.   In fact, the Defendant testified: "I signed it with the understanding that it was going to Waterland Fisheries to their deposit account."   *See* Tr. March 20, 2017, pp. 83-86.

59. The Defendant further testified that had there been sufficient funds to pay Harbor Bank, then he would have paid Harbor Bank but that his priority was getting the funds into the Waterland Deposit Account and that any concerns regarding his contractual obligations to Harbor Bank "would have been secondary to trying to get the monies into the Waterland accounts."   *See* Tr. March 20, 2017, pp. 83-86.

60. Despite the Defendant's email to Stanley Arnold on August 12, 2014, stating that the Defendant intended to present Harbor Bank with a plan to take care of Waterland's debt by the end of the following week, Defendant admitted that he did not deliver the Insurance Proceeds to Harbor Bank after they were transferred into the Waterland Deposit Account on August 15, 2014 because he "did not get involved in dealing with Harbor at that point."   *See* Tr. March 20, 2017, p. 86; *see also* Harbor Bank Ex. 24.

61. The Defendant testified that Joann Anderson was present at the mediation with Selective and that after the mediation, the Defendant and Joann Anderson discussed that the Settlement Amount was insufficient to pay off Waterland's indebtedness and keep the business functioning but they did not discuss what should happen with the proceeds. The Defendant further testified that he did not discuss with Joann Anderson the fact that she transferred the Insurance Proceeds to herself.   *See* Tr. March 20, 2017, pp. 101-102.

62. Joann Anderson testified that she either told the Defendant "just prior" to the Anderson Transfer that she was taking the funds or she told him "just after" she took the funds, but either way, she was clear that she made the decision to take the funds based on her discussion with the restructuring experts retained by the Defendant.   *See* Tr. March 20, 2017, pp. 159-163; Tr. March 29, 2017, p. 35.

63. Joann Anderson's trial testimony contradicted her statements in a prior affidavit and deposition, and was inconsistent with the evidence in the following ways:

> (i) Joann Anderson testified at trial that she made numerous loans to Waterland over time that totaled $510,000.00, however, in an affidavit she made in

17

connection with the foreclosure of the Property, she stated that she extended the $510,000.00 loan on January 16, 2013, the date the Demand Note was executed;

(ii) Harbor Bank's Exhibit No. 36 was a spreadsheet Joann Anderson provided of the various payments she made to Waterland in connection with the $510,000.00 loan.   The spreadsheet reflects a total amount of $453,400.00 and not $510,000.00;

(iii) Harbor Bank's Exhibit No. 36 also contains copies of checks produced by Joann Anderson to support the loan(s) she made to Waterland.   The checks she produced total $320,900.00.   Joann Anderson testified that despite meeting with Capital One Bank and United Bank, the banks were unable to produce any checks in addition to the ones she produced;

(iv) Joann Anderson stated under oath in her deposition that she told the Defendant prior to the Anderson Transfer that she was going to take the funds but at trial, she stated she did not tell him that she took the proceeds until after the transfer.   She then stated at trial that she either told him immediately prior to the transfer or afterwards buts she was clear that it was her decision to take the funds.   She could not recall the Defendant's response when she informed him that she transferred the funds.

*See* Harbor Bank Ex. No. 26; *see also* Transcript March 20, 2017, pp. 131-37, 159-163.

64. As of August 15, 2014, the balance owed to Harbor Bank from Waterland was approximately $1,040,034.00.   *See* Tr. March 20, 2017, p. 27.

65. Harbor Bank received approximately $195,000.00 from litigation with Selective and $145,000.00 from Joann Anderson in connection with these matters.   *See* Tr. March 20, 2017, p. 41.

66. As of August 15, 2014, the balance owed to MARBIDCO from Waterland and the Defendant as guarantor of MARBIDCO's loan to Waterland was $239,343.00.   *See* Tr. March 28, 2017, p. 24.

67. As of August 15, 2014, the balance owed to Commerce from Waterland and the Defendant as guarantor of the Commerce Loan was $378,278.38.   *See* Tr. March 28, 2017, pp. 58-59.

68. The ending balance in the Waterland Deposit Account as reflected in the statement dated August 31, 2014, was $6,889.91.   *See* Harbor Bank Ex. No. 43.   Joann Anderson testified that by that time, the Waterland Deposit Account had become Waterland's primary operating account, although Waterland's other accounts remained open.   *See* Tr. March 29, 2017, pp. 97-98, 127.

69. The appraised value of the Property as of March 19, 2013, was $450,000.00.  *See* Harbor Bank Ex. No. 39.   The Property ultimately sold for $399,000.00 at a foreclosure auction on February 11, 2015, the net proceeds of which went to Harbor Bank based on its first-priority lien as agreed to in the Consolidated Intercreditor Agreement.  *See* Harbor Bank Ex. No. 14 and 41.

70. The Sales Report, dated July 20, 2016, which was prepared by Rasmus Auctions in connection with the auction of Waterland's personal property, indicates that the total amount received from the auction of Waterland's personal property was $5,070.39 despite the Defendant's testimony that Waterland's equipment had a value of "almost a million and a half to $2 million[.]"  *See* Harbor Bank Ex. No. 40; *see also* Tr. March 20, 2017, p. 103.

71. The evidence was inconclusive as to Waterland's solvency as of August 2014.

## II.    The Complaints and Answers

### A.   The Maryland Complaint

The Maryland Complaint is a one-count complaint seeking a determination that the amounts owed to the Maryland Plaintiffs are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[8] The gravamen of the Maryland Complaint is that the Defendant, both as an agent of Waterland and in his individual capacity, fraudulently induced Commerce to make the Commerce Loan by agreeing to a priority scheme for the Insurance Proceeds, as set forth in the various documents executed on July 26, 2013, including the Anderson Subordination Agreement, the Consolidated Intercreditor Agreement, and the Assignment of Insurance Proceeds.   In turn, MARBIDCO agreed to weaken its position as a secured creditor under the belief that Waterland's long-term viability would be improved by the Commerce Loan and the Insurance Proceeds, thereby increasing the likelihood that Waterland would be able to pay all of its creditors.

### B.   The Harbor Bank Complaint

The Harbor Bank Complaint contains four counts.   Count I alleges that the Defendant

---

[8] Hereafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

19

should be denied a discharge under § 727(a)(2)(A) because he transferred or permitted the transfer of the Insurance Proceeds with the intent to hinder, delay, or defraud Harbor Bank.   Count II alleges that the obligations owed to Harbor Bank by the Defendant are nondischargeable under § 523(a)(4) because the Defendant committed fraud or defalcation while acting in a fiduciary capacity, and also committed embezzlement and/or larceny.   Count III alleges that the obligations owed to Harbor Bank by the Defendant are nondischargeable under § 523(a)(6) because the Defendant's actions regarding the Insurance Proceeds willfully and maliciously injured Harbor Bank.   Lastly, Count IV alleges that the obligations owed to Harbor Bank by the Defendant are nondischargeable under § 523(a)(2)(A) because the transfer of the Insurance Proceeds to Joann Anderson was fraudulent.

### C. The Defendant's Answers and Defenses

The Defendant did not necessarily break down his defenses by cause of action so the Court will summarily recap his defenses to all allegations.   The Defendant argued that the Plaintiffs failed to establish that they had a perfected security interest in the Waterland Deposit Account (*i.e.*, "control" over the account as defined by the Maryland Uniform Commercial Code) into which the Insurance Proceeds were deposited.   The Defendant maintained that Joann Anderson was entitled to the Insurance Proceeds because as a signatory on the Waterland Deposit Account, she was the only secured creditor with "control" over the account pursuant to Md. Code Ann., Com. Law § 9-104.[9]

---

[9] Md. Code Ann., Com. Law § 9-104 provides:
  (a)  A secured party has control of a deposit account if:

   (1) The secured party is the bank with which the deposit account is maintained;

   (2) The debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or

   (3) The secured party becomes the bank's customer with respect to the deposit account.

This argument was raised repeatedly by the Defendant in his pleadings and was the basis for an oral

motion for judgment as a matter of law at trial.   The Defendant further argued that MARBIDCO did

not have a perfected interest in the Insurance Proceeds or in the Waterland Deposit Account at the

time of the Insurance Settlement because its UCC filing had lapsed.   He also maintained that the

failure of the Plaintiffs to submit the Selective Policy into evidence somehow established that they

were not a loss payee or additional insured under the Policy.   He similarly argued that failure of the

Plaintiffs to take additional steps as part of their loan processes or to intervene in the Selective

Litigation somehow negated or weakened their security interests, including requiring Waterland to

maintain a deposit account at Harbor Bank, filing letters of protection with Kramon & Graham, or

requiring separate account control agreements for Waterland's bank accounts.   As such, he argued

that the Plaintiffs have relied on nothing more than hindsight in an attempt to cover up their own

negligence.   Of particular relevance to Harbor Bank's § 727 allegations, the Defendant asserted that

the Insurance Proceeds were not transferred to Joann Anderson by the Defendant.   Rather, he

argued that Kramon & Graham, Waterland's counsel in the Selective Lawsuit, transferred the

Insurance Proceeds into the Waterland Deposit Account and then Joann Anderson transferred the

Insurance Proceeds to herself.   Lastly, the Defendant disputed that the evidence established that

Waterland was insolvent in 2014, and also disputed that Waterland had defaulted on its obligations

to the Plaintiffs at the time of or as a result of the Anderson Transfer.

### III.   Analysis

#### A.  11 U.S.C. § 727(a)(2)(A)

The Court will address Harbor Bank's objection to discharge first because if Harbor Bank

---

(b) A secured party that has satisfied subsection (a) has control, even if the debtor retains the
right to direct the disposition of funds from the deposit account.

prevails on this count, the Court need not analyze the individual dischargeability causes of action.

"Section 727 of the Bankruptcy Code allows debtors to receive a general discharge of their debt in keeping with the Code's purpose of giving honest debtors a fresh start 'unhampered by the pressure and discouragement of preexisting debt.'" *Wachovia Bank, N.A. v. Voccia (In re Voccia)* 477 B.R. 625, 631 (Bankr. E.D. Va. 2011)(citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir.1994)).   Due to the extreme penalty imposed by section 727, *i.e.,* the denial of discharge, objections to discharge are construed strictly against the objecting party and liberally in favor of the debtor.   *See State Bank of India v. Chalasani (In re Chalasani*), 92 F.3d 1300, 1310 (2d Cir. 1996). The party objecting to a debtor's discharge bears the burden of proving its objection by a preponderance of the evidence.   *Farouki v. Emirates Bank Intern.*, *Ltd*. 14 F.3d at 249 -250. "Although the burden may shift to the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor."   *Id.*

Section 727(a)(2)(A) provides, in relevant part:

> (a) The court shall grant the debtor a discharge, unless--
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>> (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A).   To bar a debtor's discharge under § 727(a)(2)(A), the plaintiff must prove each of the following four elements by a preponderance of the evidence: (1) the debtor transferred, removed, destroyed, mutilated or concealed, (2) his or her property, (3) within one year of the bankruptcy petition's filing, (4) with the actual intent to hinder, delay, or defraud a creditor. *Id.*   Because the fourth element is worded in the disjunctive, it is not necessary to prove fraudulent intent in order to deny a discharge.   *Consumers United Capital Corp. v. Greene (In re Greene),* 202

B.R. 68, 73 (Bankr. D. Md. 1996).   The fact that a debtor's "motivation for making the transfer was at least in part to fulfill his obligation to other creditors in order to save his business is not a valid defense." *Id.*

Here, Harbor Bank argued that the Defendant's actions in permitting the transfer of the Insurance Proceeds to Joann Anderson and concealing the Insurance Proceeds from Harbor Bank are sufficient to deny the Defendant a discharge under § 727(a)(2)(A).   Harbor Bank asserted that the facts of this case contain a number of the "badges of fraud" that this Court outlined in *Lafarge N. Am., Inc. v. Poffenberger (In re Poffenberger)*, 471 B.R. 807 (Bankr. Md. 2012), including: (a) a lack or inadequacy of consideration for the transfer; (b) the existence of a family or insider relationship between the parties; (c) the retention of possession, benefit or use of the property in question by the Defendant; (d) the financial condition of the Defendant before and after the transfer; (e) the Defendant's attempt to keep the transfer a secret; and (f) the proximity of the transfer to the Defendant's bankruptcy filing.   Harbor Bank argued that although Waterland started out as a legitimate business entity, the Defendant's actions in Waterland's latter years, including the Defendant becoming the sole shareholder and his comingling of Waterland's funds with his personal accounts, blurred the line between the corporation and the Defendant to the point where they were one and the same.   Harbor Bank further argued that once the Anderson Transfer was effectuated, the Insurance Proceeds became joint property of the Defendant and Joann Anderson because the majority of the funds loaned as part of the $510,000.00 Anderson Loan came from accounts jointly owned by the Defendant and Joann Anderson.   As such, Harbor Bank argued that the Defendant was a co-lender on the Anderson Loan so that the funds became his once they were transferred out of the Waterland Deposit Account.

After denying the Defendant's oral motion for judgment as a matter of law at trial,[10] the Court asked Harbor Bank whether there was any basis to proceed on the objection to discharge issue because the Insurance Proceeds were not the Defendant's property, as required by § 727(a)(2)(A). Rather, the Insurance Proceeds belonged to Waterland.   In response, Harbor Bank asserted that Waterland and the Defendant were one in the same based on the Defendant's control over the company.   In other words, although not phrased as such in the Harbor Bank Complaint, Harbor Bank argued that Waterland was the "alter ego" of the Defendant.   Thus, Harbor Bank maintained that Defendant's instructions to Kramon & Graham that the Insurance Proceeds be placed in the Waterland Deposit Account where Joann Anderson could access the funds satisfies the requirements of § 727(a)(2)(A).

The Court disagrees that § 727(a)(2)(A) is satisfied here.   Property of the bankruptcy estate includes all legal or equitable interests of the debtor in property as of the commencement of the case, wherever located and by whomever held.   11 U.S.C. § 541.   Despite the Bankruptcy Code's broad definition of "property of the estate," assets owned by a corporation in which a debtor is a stockholder are not property of the debtor, but that of the corporation—even where an individual defendant is the sole stockholder of the corporation.   *Simpson v. Levitsky (In re Levitsky)*, 401 B.R. 695, 710 (Bankr. D. Md. 2008)(citing *Kreisler v. Goldberg,* 478 F.3d 209, 214 (4th Cir.2007)). Here, in seeking relief under § 727(a)(2)(A), Harbor Bank bears the burden of proving that the Insurance Proceeds were property of the Defendant's bankruptcy estate.   To do so, Harbor Bank

---

[10] The Court denied the Defendant's oral motion for judgment as a matter of law because Defendant failed to present sufficient evidence that Joann Anderson had superior rights to the Insurance Proceeds based solely on her ability to access the funds in the Waterland Deposit Account. The Court explained that Defendant was confusing Joann Anderson's rights as a secured creditor subject to an established and agreed upon priority scheme in the Defendant's assets with her ability to access the funds in the United Bank account based on her position as Waterland's "administrator" or Secretary with check-signing authority for the company.   The Court previously rejected this same argument at the summary judgment stage and Defendant failed to present new evidence to support this argument at trial.

must establish that Waterland was a fraudulent entity—created by the Defendant to hinder, delay and defraud creditors, and that the Defendant disregarded corporate formalities in using Waterland for his own personal benefit. *Id.* This scenario has been called "reverse veil piercing"[11] because it permits creditors to pursue corporate property fraudulently treated by a debtor for the benefit of the debtor's creditors. *Id.* This theory of recovery has been applied when a debtor in bankruptcy treats a corporation as his alter ego. *Id.*

"Courts apply the [alter ego doctrine] 'with great caution and reluctance' and only in 'exceptional circumstances.'" *Rosen v. Kore Holdings, Inc. (In re Rood)*, 448 B.R. 149, 159 (D. Md. 2011)(quoting *Hildreth v. Tidewater Equipment Co., Inc.* 838 A.2d 1204, 1210 (2003)). The *Rood* Court recognized that although there is no universal criteria to determine whether to apply the alter ego doctrine, common factors considered by courts include:

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.* (quoting *Hildreth*, 838 A.2d at 1210). The party seeking application of this doctrine bears the burden of proof. *Id.*

Here, Harbor Bank did not establish by a preponderance of the evidence that Waterland was the Defendant's alter ego. Although the Defendant was Waterland's President and sole shareholder during the relevant time period, Harbor Bank failed to establish that Waterland was a sham organization created by the Defendant to hinder, delay and defraud creditors. *In re Levitsky*, 401 B.R. at 710. To the contrary, there was substantial evidence that Waterland was created for a

---

[11] Piercing the corporate veil in the traditional sense entails holding a stockholder individually liable for the debts of the corporation. *See id.*

legitimate business purpose and operated for several years prior to the First Loss.   The multitude of loan documents executed by Waterland and the various lenders over the course of its existence is significant proof that it was a legitimate business entity.   Moreover, the Defendant was only the sole shareholder as of the spring of 2013.   There were other shareholders prior to that time.   In sum, there was insufficient evidence that the Defendant failed to maintain corporate formalities or that Waterland was established and/or maintained as a sham entity to hinder, delay or defraud creditors. Having failed to establish that the Defendant transferred or permitted his property to be transferred with the intent to hinder, delay or defraud a creditor, the Court will not deny the Defendant a discharge under § 727(a)(2)(A).

### B.   11 U.S.C. § 523(a)(4)

Count II of the Harbor Bank Complaint is based on § 523(a)(4), which excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."   11 U.S.C. § 523(a)(4).   Harbor Bank argues that the Defendant, while acting in a fiduciary capacity as President of Waterland, intentionally diverted the Insurance Proceeds from Harbor Bank to Joann Anderson.   Harbor Bank further argues that Defendant's intentional diversion of the Insurance Proceeds amounts to embezzlement and/or larceny.   As set forth below, the Court does not find that the requirements of § 523(a)(4) are met here.[12]

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."   This Court has held that in order to prevail under § 523(a)(4), a plaintiff alleging fiduciary defalcation or fraud must show:

(1) the establishment of an express or technical trust regarding the funds;

---

[12] Preliminarily, the Court notes that exceptions to discharge are strictly construed against creditors to protect a debtor's fresh start.   *See Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 371 (Bankr. D. Md. 2005).   To succeed in a dischargeability action under § 523(a), the moving party must prove all required elements by a preponderance of the evidence.   *See id.*

(2) that the debtor acted in a fiduciary capacity; and

(3) the debt is based upon the debtor's fraud or defalcation while acting as a fiduciary.

See *Fleming v. Gordon (In re Gordon)*, 491 B.R. 691, 697 (Bankr. D. Md. 2013).   "While state law is important in determining when a trust relationship exists, the issue [of whether the debtor was acting in a fiduciary capacity] is ultimately a federal question." *Spinosa v. Heilman (In re Heilman),* 241 B.R. 137, 158 (Bankr. D. Md. 1999)(quoting *Stahl v. Lang (In re Lang)*, 108 B.R. 586 (Bankr. N.D. Ohio 1989)).   The term is to be narrowly construed in the dischargeability context and has been consistently limited to express trusts and not to trusts implied by law from contracts.   *Id.* at 158-9.   "The Courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent." *Id.* (quoting *Borg-Warner Acceptance Corp. v. Miles (In re Miles)*, 5 B.R. 458 (Bankr. E.D. Va. 1980)).   As set forth by this Court in *In re Heilman*:

> Only fiduciaries in fact who are similar to those enumerated in *Chapman v. Forsyth*, 43 U.S. 202 (1844) will meet the test. In that case, they were public officers, executors, administrators, guardians and trustees. As the Supreme Court held in *Chapman,* "and the 'other fiduciary capacity' mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract.

*Id*. at 159.   "An express or technical trust is a formal fiduciary relationship whose creation is based upon the intentions of a settlor and/or a beneficiary." *In re Gordon*, 491 B.R. at 698.   "When evaluating the alleged existence of an express trust, courts, above all else, look for a manifestation of intent by one party to confer on another equitable duties to act." *Id.* (citing *Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493 (4th Cir. 2008)).   Although the use of the term "trust" is to be given great weight, it is not determinative.   *In re Strack*, 524 F.3d at 498.

Once the requisite fiduciary relationship is established, the plaintiff must then establish that

the defendant committed fraud or defalcation.   It is well settled that "fraud" within the meaning of §

523(a)(4), requires positive fraud or fraud in fact, involving moral turpitude or intentional wrong —

it cannot be implied fraud or fraud in law, which may exist without bad faith or immorality.   *See*

*Lawrence Steel Erection Co., Inc. v. Piercy (In re Piercy),* 140 B.R. 108, 114 (Bankr. D. Md. 1992);

*see also Kovens v. Goodwich (In re Goodwich)*, 517 B.R. 572, 583-4 (Bankr. D. Md. 2014).

"Likewise, it is now also well settled that in the context of [§ 523(a)(4)], 'defalcation' requires a

finding of at least 'an intentional wrong' or in the absence of intentional wrongdoing, a finding that

'the fiduciary consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk'

that his conduct will turn out to violate a fiduciary duty."   *Id.* at 584 (quoting *Bullock v.*

*BankChampaign,* 569 U.S. 267, 273-274 (2013)).

Larceny and embezzlement are additional bases to except debts from discharge under §

523(a)(4).   "Courts define larceny for § 523(a)(4) purposes by looking to federal common law and

are not bound by state law."   *Hickman v. Wimbrow (In re Wimbrow)*, 11-12246 BLS, 2012 WL

3069527 *3 (Bankr. D. Del. July 27, 2012).   "Federal common law and federal practice define

larceny as a 'felonious taking of another's property with intent to convert or deprive the owner of the

same.'"   *In re Gordon*, 491 B.R. at 700.   To establish a claim for larceny under § 523(a)(4), the

plaintiff must show that the defendant unlawfully misappropriated funds for his or her own benefit

and that he did so with fraudulent intent that was malicious or wrongful.   *In re Wimbrow*, 2012 WL

3069527 at *3.   Similarly, federal law is controlling as to the definition of embezzlement.

*O'Connor, CPO v. Booker (In re Booker)*, 165 B.R. 164, 171 (Bankr. M.D.N.C. 1994).   Under

federal law, embezzlement requires: 1) property rightfully in the possession of a nonowner; (2) the

nonowner's appropriation of the property to a use other than which it was entrusted; and (3)

circumstances indicating fraud.   *Id.*   "Embezzlement under Section 523(a)(4) has been defined as

'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'"   *In re Heilman*, 241 B.R. at 171 (quoting *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172–73 (6th Cir. 1996)).   "In order to establish embezzlement, the creditor must prove the entrustment to the debtor of her property which the debtor, with intent to defraud, appropriates for a use other than that for which it was entrusted." *Limberger v. Cleary (In re Cleary)*, 487 B.R. 633, 643 (Bankr. D. Md. 2013), *aff'd,* No. ADV 08-00264, 2013 WL 6713188 (D. Md. Dec. 18, 2013), *aff'd sub nom. Limberger v. Cleary*, 585 F. App'x 165 (4th Cir. 2014).   Fraudulent intent is the key to a finding of embezzlement or larceny and may be established by circumstantial evidence.   *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 854-55 (Bankr. E.D. Va. 1986).

As stated previously, Harbor Bank argued that the Defendant, while acting in a fiduciary capacity as President of Waterland, intentionally diverted the Insurance Proceeds from Harbor Bank to Joann Anderson.   Harbor Bank based the Defendant's asserted fiduciary capacity on Maryland law that a director of a corporation occupies a fiduciary relation to the corporation and its stockholders.   *See Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1000 (Md. 2007).   Although not argued in closing, Harbor Bank's pleadings further asserted that Defendant's intentional diversion of the Insurance Proceeds amounts to embezzlement and/or larceny.

Harbor Bank's assertion that the Defendant was acting in a fiduciary capacity confuses the Defendant's obligations to Waterland and its shareholders based on his position as President and Chairman of the Board with his obligations to creditors of Waterland.   As explained by the Court of Appeals of Maryland, a director of a corporation is required to perform his duties:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

*Storetrax.com, Inc. v. Gurland*, 915 A.2d at 1000–01 (citing MD. CODE ANN., CORPS. & ASS'NS ART., § 2–405.1(a)).   However, these "fiduciary" obligations do not automatically extend to creditors of a corporation.   Rather, courts are divided on whether a corporate director becomes a fiduciary to a corporation's creditors upon the corporation's insolvency for purposes of § 523(a)(4). *See In re Heilman*, 241 B.R. 152-153, n.10.   Here, the Plaintiffs failed to establish that Waterland was insolvent at the time of the Anderson Transfer.   The testimony was simply inconclusive. Therefore, Harbor Bank was required to prove the existence of an express or technical trust regarding the Insurance Proceeds and it failed to do so.   See *In re Gordon*, 491 B.R. at 697-699. There was no express trust governing the Insurance Proceeds nor was their evidence that the parties intended to create an express or technical trust to govern the Insurance Proceeds.   Harbor Bank had a security interest in the Insurance Proceeds.   Commerce also had a security interest in the Insurance Proceeds and Waterland had a separate agreement assigning the Insurance Proceeds to Commerce.   Commerce then agreed to subordinate its security interest in the Insurance Proceeds to Harbor Bank under the Consolidated Intercreditor Agreement.   None of these documents took the Insurance Proceeds outside the purview of the ordinary creditor-debtor commercial relationship. The law is clear that the term "fiduciary capacity" is to be narrowly construed for purposes of § 523(a)(4) and does not extend to trusts implied by law from contracts.   *See In re Heilman*, 241 B.R. 159.

Because the Court does not find that the Defendant was acting in a fiduciary capacity with respect to the Insurance Proceeds, the Court need not determine whether the Defendant committed

defalcation or fraud by instructing Kramon & Graham to wire the Insurance Proceeds into the Waterland Deposit Account rather than turning them over to Harbor Bank.   However, Harbor Bank has also alleged that the Defendant committed embezzlement and/or larceny, which are additional bases for relief under § 523(a)(4).   Both embezzlement and larceny involve a defendant's actions with respect to property belonging to a third party.   Here, the Insurance Proceeds were Waterland's property, albeit property that had been assigned to a third party.   Moreover, the Settlement Check was payable to Waterland and Kramon & Graham.   Therefore, Waterland's receipt/possession of the funds was lawful.   Based on these facts, the Defendant neither committed larceny nor embezzlement.

In sum, Harbor Bank failed to establish by a preponderance of the evidence that the Defendant was acting in a fiduciary capacity when he failed to remit the Insurance Proceeds to Harbor Bank.   Harbor Bank also failed to establish that the Defendant's actions constitute embezzlement or larceny.

### C.   11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.   11 U.S.C. § 523(a)(2)(A).   To succeed in an action under § 523(a)(2)(A), a plaintiff must prove the following elements by a preponderance of the evidence:

> (i)    the defendant made a representation;
> (ii)   the defendant knew at the time he made the representation that it was false;
> (iii)  the defendant made a representation with the intent and purpose to deceive the plaintiff;
> (iv)   the plaintiff justifiably relied on the false representation; and
> (v)    the plaintiff suffered damages as a proximate result of the representation.

*In re Koep*, 334 B.R. at 371-372 (citing *In re Heilman*, 241 B.R. at 149)).

"'Actual fraud,' as the term is employed in § 523(a)(2)(A), is defined as 'any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'"   *In re Heilman*, 241 B.R. at 150 (*quoting Wilcoxon Constr., Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 523 (Bankr. D. Md. 1995)).   Misrepresentation under § 523(a)(2)(A) can be express or implied and can be any words or conduct that produce a false or misleading impression of fact in the mind of another.   *In re Koep*, 334 B.R. at 372; *Parker v. Grant (In re Grant)*, 237 B.R. 97, 113 (Bankr. E.D. Va. 1999).   "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct intended to create and foster a false impression.'" *Id.* (quoting *In re Newmark,* 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982)).   "The fraud or misrepresentation must have existed at the time of, and been the methodology by which, the money, property or services were obtained."   *In re Heilman*, 241 B.R. at 150.   "Later misrepresentations are irrelevant for purposes of determining dischargeability under Section 523(a)(2)(A)."   *Id.*   "Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means."   *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219–20 (4th Cir. 2007).

 Intent to deceive under § 523(a)(2)(A) may be inferred from the circumstances of the particular case, "including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them."   *In re Koep*, 334 B.R. at 372.   Reliance is also based on the circumstances of the case and a plaintiff's reliance must be justifiable rather than reasonable.   *Id.*

In this case, the Plaintiffs relied on different aspects of § 523(a)(2)(A) to argue that their

respective debts are nondischargeable.   The Maryland Plaintiffs, in particular Commerce, argued that the Defendant induced Commerce to make the Commerce Loan by agreeing to a priority scheme for the Insurance Proceeds, as set forth in the various documents executed on July 26, 2013, including the Anderson Subordination Agreement, the Consolidated Intercreditor Agreement, and the Assignment of Insurance Proceeds.   The Maryland Plaintiffs asserted that the Defendant represented to Commerce that the Insurance Proceeds would be used to either invest in Waterland, thereby increasing the value of the business and its assets, or be turned over to Waterland's creditors, thereby reducing the amount owed to Harbor Bank and increasing the value of Commerce's secured interest in Waterland's assets.   In turn, MARBIDCO agreed to weaken its position as a secured creditor under the belief that Waterland's long-term viability would be improved by the Commerce Loan and the Insurance Proceeds, thereby increasing the likelihood that Waterland would be able to pay all of its creditors.   The Maryland Plaintiffs further asserted that the Defendant and Joann Anderson (together, the "Andersons") conspired back in 2012 to fraudulently induce Commerce to invest in Waterland when they realized that Waterland was no longer viable and that they were not going to recoup any money that they had invested into the business.   The Andersons allegedly concocted a plan to find a new investor (Commerce) at which time the Andersons created fraudulent loan documents to support a loan from Joann Anderson that the Maryland Plaintiffs maintain never happened.   The Andersons also established the Waterland Deposit Account on the asserted false premise of receiving and segregating the proceeds of the Commerce Loan when in fact, the Andersons created the account after the execution of the Anderson Subordination Agreement so that Joann Anderson could access any proceeds received from Selective by claiming a superior security interest in any funds deposited into the Waterland Deposit.   The Andersons then concealed the Insurance Settlement and the Anderson Transfer and justified their concealment by relying on a

misguided reading of various documents addressing the confidentiality of the settlement.

Harbor Bank, on the other hand, relied on the Supreme Court's decision *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016) in which the Supreme Court held that "actual fraud" under § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation.   Harbor Bank argued that the Defendant was contractually obligated to deliver the Insurance Proceeds to Harbor Bank and his instructions to Kramon & Graham to transfer the proceeds into the Waterland Deposit Account where Joann Anderson could access them was fraudulent.

In his defense, the Defendant maintained that the conspiracy theory propounded by the Maryland Plaintiffs defies common sense and was simply a post hoc rationalization for their failure to adequately protect their interests.   The Defendant also challenged the Plaintiffs' expansive reading of the *Husky* decision.   For the following reasons, the Plaintiffs cannot prevail under § 523(a)(2)(A).

Addressing the Maryland Plaintiffs' arguments first, the Court finds that although their summation at closing was compelling, there was little evidence to support their fraud-based conspiracy theory.   Initially, the Court notes that there was no evidence that the Defendant had overstated the anticipated insurance settlement.   To the contrary, the Defendant consistently maintained that Waterland would receive between two and three million dollars from the Selective Lawsuit and there was no evidence to refute his belief in the truthfulness of his representations. None of the Plaintiffs ever intervened in the Selective Lawsuit to obtain first-hand knowledge of the Lawsuit's status.   Rather than independently determining the status of the insurance claim as permitted by their loan documents, the evidence showed that the Plaintiffs relied on the Defendant's

34

representations as to the amount Waterland expected to receive from Selective and the status of the Selective Lawsuit/Settlement.   The Court also rejects the Maryland Plaintiff's argument that the Andersons falsified the loan documents supporting Joann Anderson's alleged $510,000.00 loan. Although, the evidence did not account for the entire $510,000.00, Joann Anderson invested significant sums of money into Waterland and the fact that much of the money she invested came from a joint account with the Defendant is inconclusive evidence that he loaned the money.   Joann Anderson testified that she had various investments that generated over a million dollars.   It is not suspect in the least that the proceeds from those investments were held in accounts she owned jointly with her husband.   Lastly, the Court does not find the timing of the opening of the Waterland Deposit Account sufficient evidence of the Defendant's fraudulent intent.   Joann Anderson's testimony that she established the account specifically to receive and monitor funds from the Commerce loan was plausible.   The Court finds it more likely that Joann Anderson's theory that she had "control" over the Waterland Deposit Account was devised when it became apparent that the settlement proceeds were insufficient to pay off Waterland's secured lenders.   The Maryland Plaintiffs failed to prove by a preponderance of the evidence that the Defendant knowingly made false representations to induce Commerce to loan Waterland money and to induce MARBIDCO to agree to the terms of the Consolidated Intercreditor Agreement.   Thus, the Maryland Plaintiffs do not prevail under § 523(a)(2)(A).

Similarly, Harbor Bank cannot prevail under § 523(a)(2)(A).   Although at first blush the holding in *Husky* appears to significantly broaden the reach of § 523(a)(2)(A), the facts in *Husky* are distinguishable from the facts in this case.   *Husky* involved a debtor who was the recipient of an alleged fraudulent transfer.   The Supreme Court explained:

> It is of course true that the transferor does not "obtain" debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can "obtain" assets "by" his or her participation in the fraud. If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyances are not wholly incompatible with the "obtained by" requirement.

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. at 1589 (citations omitted).   This explanation makes clear that the seemingly expansive holding in *Husky* is limited to the rare circumstances where the debtor is the recipient of a fraudulent transfer, not the transferor.   In this case, Joann Anderson was the recipient of the alleged fraudulent transfer and is not the debtor in this case.   Accordingly, the same analysis set forth above applies to Harbor Bank and there is no evidence that the Defendant "tricked" Harbor Bank into loaning Waterland money through fraudulent means.   *See In re Rountree*, 478 F.3d at 219–20.   Thus, Harbor Bank cannot prevail under § 523(a)(2)(A).

### D.   <u>11 U.S.C. § 523(a)(6)</u>

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C. § 523(a)(6).   "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998).   "Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead 'willful acts that cause injury.'" *Id.* "Or, Congress might have selected an additional word or words, *i.e.,* 'reckless' or 'negligent,' to modify 'injury.'"   *Id.*   As explained by the Supreme Court:

> [A]s the Eighth Circuit observed, the (a)(6) formulation triggers in the

> lawyer's mind the category "intentional torts," as distinguished from
> negligent or reckless torts.   Intentional torts generally require that the actor
> intend "the *consequences* of an act," not simply "the act itself." Restatement
> (Second) of Torts § 8A, Comment *a*, p. 15 (1964) (emphasis added).

*Id.* at 61-62.   "Since the *Geiger* decision, courts have struggled to determine whether a debtor

must have specifically intended the injury or whether the commission of an intentional tort that is

'substantially certain to result in injury' is sufficient to satisfy the willfulness requirement."   *Haas*

*v. Trammell (In re Trammell),* 388 B.R. 182, 186-87 (Bankr. E.D. Va. 2008).   "The Court of

Appeals for the Fourth Circuit appears to have adopted the 'objective substantial certainty' or

'subjective motive' test to satisfy the willfulness requirement."   *Id. (citing Parsons v. Parks (In re*

*Parks),* No. 03−1072, 2003 WL 22989684, at *1 (4th Cir. Dec. 19, 2003) ("[t]he test, then, is

whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective

motive to cause harm.'")).

> Where a breach of contract is involved, § 523(a)(6) requires more than a mere breach to

render a debt nondischargeable.   *See Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 781

(Bankr. E.D. Va. 2012).   Rather, the breach must be accompanied by some conduct that is legally

wrong or tortuous.   *Id.*   Breaches of contract that involve intentional or substantially certain injury

may be sufficient for § 523(a)(6) purposes.   *See In re Williams*, 337 F.3d 504, 510 (5th Cir.

2003)("Accepting that Section 523(a)(6) excepts contractual debts from discharge when those debts

result from an intentional or substantially certain injury, our inquiry now focuses upon the nature of

the injury [the Debtor] inflicted on the [creditor]."); *see also Kforce, Inc. v. Kearse (In re Kearse)*,

No. 09-16416PM, 2010 WL 2025518, at *2 (Bankr. D. Md. May 18, 2010)(unreported

decision)(acknowledging that breaches of contract may involve intentional or substantially certain

injury to render a debt nondischargeable under § 523(a)(6)).   "[A] breach of contract that occurs in

the context of other aggravating factors may well give rise to a viable claim under Section

523(a)(6)."   *VW Credit, Inc. v. Salim (In re Salim)*, No. 13-42974-ESS, 2015 WL 1240000, at *24

(Bankr. E.D.N.Y. March 16, 2015), *aff'd sub nom. Salim v. VW Credit, Inc.*, 577 B.R. 615 (E.D.N.Y.

2017).   "Such factors include the failure to pay [a debt] from funds that the debtor had agreed

specifically to earmark for that purpose ... [which were] accessible and not otherwise encumbered ...

[and where the debtor] deliberately and intentionally refused to turn over the sale proceeds.'"  *Id.*

(quoting *Alessi v. Alessi (In re Alessi),* 405 B.R. 65, 68 (Bankr.W.D.N.Y.2009)).   Again, a debtor's

misconduct under § 523(a) need only be shown by a preponderance of the evidence.   *First Nat'l.*

*Bank of Md. v. Stanley (In re Stanley)*, 66 F. 3d 664, 667 n.4 (4th Cir. 1995) (citing *Grogan v.*

*Garner*, 498 U.S. 279 (1991)).

Both the Maryland Plaintiffs and Harbor Bank argued that their debts are

nondischargeable in the Defendant's bankruptcy case under § 523(a)(6) based on the Defendant's

conduct as President of Waterland and based on his personal guarantees.   Harbor Bank argued

that the Defendant deliberately and intentionally converted Harbor Bank's funds by not delivering

the Insurance Proceeds to Harbor Bank and instead, directing that the proceeds be placed in the

Waterland Deposit Account.   The Maryland Plaintiffs argued that the Defendant willfully and

maliciously injured them because he knew or should have known that the actions taken by

Commerce and MARBIDCO in reliance upon his fraudulent representations would cause them

substantial losses of money.   The Court agrees that the Defendant's obligations to Harbor Bank

are nondischargeable under § 523(a)(6), but finds that the Defendant's obligations to the Maryland

Plaintiffs are dischargeable.

The Court will address the willful and malicious injury to Harbor Bank first.   As set forth

as part of the § 727 discussion, the Defendant consistently relied on Joann Anderson's asserted

"control" of the Waterland Deposit Account to argue that her interest in any funds in the account

38

trumped the other secured creditors.    Despite Defendant's persistence on this issue, the Court

finds it to be incorrect and a red herring.    As stated previously, Joann Anderson did not have a

deposit account control agreement for the Waterland Deposit Account.    Rather, she was an

authorized signer of the account based on her status as Waterland's Secretary and Treasurer.

More importantly, Harbor Bank had a security interest in the Insurance Proceeds.    Waterland

assigned its interest in the Insurance Proceeds to Commerce.    Commerce subordinated its interest

in the Insurance Proceeds to Harbor Bank through the Consolidated Intercreditor Agreement

thereby giving Harbor Bank a first-priority lien and security interest in the Insurance Proceeds.

The Anderson Security Agreement does not specifically include insurance proceeds as part of the

collateral subject to her lien, nor does the Anderson Subordination Agreement pursuant to which

Joann Anderson subordinated her interest in Waterland's assets to Commerce specifically include

insurance proceeds.    Moreover, Joann Anderson was not a party to the Assignment of Insurance

Proceeds between Waterland and Commerce through which Waterland assigned its interest in any

and all insurance proceeds received by Waterland from Selective for the prior damage to the

Property.    Without question, the Insurance Proceeds were supposed to be turned over to Harbor

Bank.    The Defendant could not alter the priority-scheme governing the Insurance Proceeds by

directing that the proceeds be transferred to the Waterland Deposit Account knowing that Joann

Anderson claimed a superior security interest in any funds in the Waterland Deposit Account.    In

other words, the Insurance Proceeds were not converted to a different form of collateral upon

transfer to the Waterland Deposit Account and thereby subject to a new priority scheme for deposit

accounts.    They remained the Insurance Proceeds and willfully placing the proceeds out of

Harbor Bank's reach caused Harbor Bank injury.

      As for the Defendant's intent to do harm, the Court finds that once he learned the

Insurance Settlement was insufficient to pay all secured creditors, the Defendant intended to put the Insurance Proceeds outside of Harbor Bank's reach in order to give Joann Anderson access to the funds.    The Defendant testified that he instructed Kramon & Graham to wire the Insurance Proceeds into the Waterland Deposit Account and further testified that his contractual obligations to Harbor Bank were secondary to getting the funds into Waterland's accounts.    Joann Anderson testified that she did not ask the Defendant's permission to effectuate the Anderson Transfer and the Defendant testified that they did not discuss the fact that she took the funds.    This Court does not believe that the Defendant and Joann Anderson, who had been married for more than 50 years and worked together at Waterland at the time, did not discuss Joann Anderson's intentions to take the Insurance Proceeds.    Moreover, the unrefuted testimony establishes, by at least a preponderance of the evidence, that the Defendant intended that the Insurance Proceeds be placed in the Waterland Deposit Account knowing that Joann Anderson claimed a superior interest to any funds in that account based on the advice of Waterland's restructuring experts.    It is of no import whether Joann Anderson told the Defendant of her intentions before or immediately after the Anderson Transfer—either way, the Defendant could have taken steps to prevent the transfer by directing that the Insurance Proceeds be transferred directly to Harbor Bank or by putting a stop payment on the check Joann Anderson wrote to herself.    In furtherance of the Defendant's scheme, the Defendant then concealed from Harbor Bank the fact that the Selective Lawsuit had settled and proceeds received.    The Defendant corresponded with Stanley Arnold of Harbor Bank in the days following the Insurance Settlement and on the day after executing the Settlement Memorandum with Kramon & Graham directing the firm to wire the Insurance Proceeds to the Waterland Deposit Account, yet he did not disclose that the Selective Lawsuit had settled.    Even more egregious, the Defendant met with Harbor Bank on August 22, 2014, and still did not

40

disclose the existence of the Insurance Settlement at that meeting.    The Defendant's interpretation of the confidentiality provisions governing the Insurance Settlement stretches credulity.    At a minimum, he was permitted to disclose the fact that the Selective Lawsuit had settled.    Had he done so, Harbor Bank could have made demand for the Insurance Proceeds and, together with the other secured lenders, reassessed their various interests and decided how to proceed rather than forcing Harbor Bank to expend time and money to recover the proceeds from third parties.    Based on these facts, the Defendant's actions constitute willful and malicious injury sufficient to render his obligations to Harbor Bank nondischargeable under § 523(a)(6).

The Court is unable to reach the same conclusion with respect to the Maryland Plaintiffs because the "injury" to the Maryland Plaintiffs is too speculative.    It is uncontested that the Insurance Proceeds were insufficient to pay Harbor Bank in full.    It is also uncontested that the Insurance Proceeds combined with the sale proceeds from the foreclosure of the Property were insufficient to pay Harbor Bank in full.    Those were the two items of collateral in which Harbor Bank had a first-priority security interest.    The Maryland Plaintiffs would not have received a portion of the Insurance Proceeds under any scenario presented.    Moreover, there was no evidence or argument that the delay caused by the Defendant's actions impacted the Maryland Plaintiffs' security interest in Waterland's personal property in which they had a first-priority lien. Without question the concealment of the Insurance Settlement and the Anderson Transfer held Waterland's secured creditors at bay for nearly a year.    However, there was no evidence that Waterland's personal property would have generated more money for the Maryland Plaintiffs had the Insurance Proceeds been immediately disclosed and turned over to Harbor Bank.    In other words, the Maryland Plaintiffs failed to establish a nexus between the Defendant's actions regarding the Insurance Proceeds and the Maryland Plaintiffs' ultimate recovery from the

disposition of Waterland's assets.    The harm to the Maryland Plaintiffs occurred when the Defendant settled with Selective for substantially less than the Defendant anticipated and there is no allegation that the Defendant acted improperly in agreeing to the Insurance Settlement. Accordingly, the Court finds that the Defendant's obligations to the Maryland Plaintiffs are dischargeable.

### IV.    Conclusion

For the reasons set forth herein, the Court determines that: (i) the Defendant will not be denied a discharge under § 727(a)(2)(A); (ii) the Defendant's obligations to Harbor Bank are nondischargeable under § 523(a)(6); and (iii) the Defendant's obligations to the Maryland Plaintiffs are dischargeable in the Defendant's bankruptcy case.    An Order consistent with this Memorandum will be entered contemporaneously herewith.

cc:    All Parties
        All Counsel

**END OF MEMORANDUM**